UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| LAMONT D. BENNETT, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) | |
| vs. | ) ) | CAUSE NO. 3:16-CV-874-PPS-MGG |
| NANCY BERRYHILL,[1] Acting Commissioner of the Social Security Administration, | ) ) ) ) | |
| Defendant. | ) | |

## **OPINION AND ORDER**

Lamont D. Bennett appeals the Social Security Administration's decision to deny his application for Social Security disability benefits. An administrative law judge found that Bennett was not disabled within the meaning of the Social Security Act. Bennett raises a number of challenges to this determination, but I conclude that the ALJ's decision was supported by substantial evidence. I will, therefore, affirm the decision of the ALJ.

### **Background**

At the time of his hearing before the ALJ, Lamont Bennett was 46 years old. [A.R. at 51.][2] He was educated through the 10th grade, received some vocational

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, as defendant in this suit.

[2] The administrative record is found in the court record at docket entry 9, and consists of 847 pages. I will cite to its pages according to the Social Security Administration's Bates stamp numbers rather than the Court's Electronic Case Filing

1

training to be "a certified building and maintenance and a cement finisher and plasterer," and did not have a driver's license. [*Id.* at 52-53] Bennett testified extensively about his sporadic employment at various jobs for various companies. He testified that he worked as an assembler for a tire company at some point around 2008, 2009, and then worked as a cement finisher for Mid-States Construction until around November 2010 and then worked at Alcoa Cobra assembling RV units for several months in 2011 and 2012. [*Id.* at 52-56.] At some point in the early 2000s, he worked for Atlantis Pool Company finishing and interlaying liners in swimming pools. [*Id.* at 57.]

Bennett says that he is in constant pain and is on medication that causes him to lose his balance. [*Id.* at 62.] He explained that his pain is in his shoulders, spine, lower back hip, knees, and that he has three fingers on his right hand that stay numb. [*Id.* at 63.] He takes OxyContin, morphine, and a stomach medication. [*Id.*] He said that he was not in physical therapy because it was backlogged to the point that he couldn't get in. [*Id.*]

Bennett's alleged onset date is February 8, 2011. When asked by the ALJ at his hearing why he chose that date, Bennett candidly admitted it was because he was "out of work" and he "was trying to get unemployment" and when he was unable to do so "Social Security . . . was the next and only outlet . . . that [he] could go to look, to look into." [*Id.* at 60.] His claim was denied initially and upon reconsideration. [*Id.* at 30.]

page number.

On May 5, 2015, Administrative Law Judge Mary Lohr held a video hearing for which Bennett appeared in Valparaiso, Indiana and the ALJ presided over from Akron, Ohio. [*Id.*] Thereafter, the ALJ issued an unfavorable decision denying Bennett disability benefits on May 2, 2015. [*Id.* at 27-45.]

In reaching her decision, the ALJ used the five-step disability evaluation process. She first found that Bennett was not engaging in substantial gainful activity. [*Id.* at 32.] The ALJ also found that the Bennett had the following severe impairments: history of left femur fracture, osteoarthritis and avascular necrosis of the lift hip status post total hip replacement, degenerative disc disease of the lumbar spine, but none of these impairments were significant enough to meet the listings set out in 20 C.F.R. Part 404, Subpart P, Appendix 1. [*Id.*] The ALJ next established Bennett's residual functional capacity ("RFC") which is the ability to work that remains after taking into account his impairments. The ALJ determined that he was able to perform sedentary work except that he can occasionally climb ramps, stairs, ladders, ropes and scaffolds, balance, steep, kneel, crouch, and crawl. [*Id.* at 34.] And although Bennett is unable perform any past relevant work as a cement finisher, tire builder and axle assembler, *id.* at 40, the ALJ ultimately concluded that, given his assigned RFC, there are jobs that exist in significant numbers in the national economy that Bennett can perform such as order clerk, charge account clerk, and information clerk. [*Id.* at 44-45.]

**Discussion**

Bennett makes two arguments; each of which he believes calls for a remand. I will consider both arguments below, but in doing so I must keep in mind that review of the Commissioner's decision is limited. My role is not to determine from scratch whether or not Bennett is disabled and entitled to benefits. Instead, my review of the ALJ's findings is deferential, to determine whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010); *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). If substantial evidence supports the Commissioner's factual findings, they are conclusive. 42 U.S.C. §405(g).

What is "substantial evidence?" The term suggests that a rigorous review is required. But it's helpful on occasion to remind ourselves just how low the Supreme Court has defined the standard of review. The Court has told us that while it is more than a "scintilla" of evidence, it's less than a preponderance of the evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The review of an ALJ's findings is a light and deferential one.

Bennett's first argument is that the ALJ's RFC is not supported by substantial evidence and, more specifically, that the ALJ mischaracterized and ignored relevant evidence in the record. [DE 12 at 9.] I disagree. Bennett argues that the RFC should have been more restrictive due to Bennett's left hip issues. The ALJ spends over two pages of her opinion documenting and analyzing the treatment history of Bennett's left

4

hip. [A.R. at 35-37.] For purposes of brevity, I will not repeat all of the ALJ's analysis, but will provide a short summary. As the ALJ addressed in her opinion, Bennett's hip trouble began when he was shot in the back of the left leg in November 2010 and appears to have eventually resulted in a hip replacement in July 2014, after which the records indicate that Bennett had an acceptable range of motion. [*Id.* at 35, 37.] In between those two events, there was a large period of time, from January 2011 to November 2011, during which Bennett did not seek treatment for complaints of hip pain. [*Id.* at 35-36.] Bennett sought treatment for hip pain three times after that as a result of fall from an eight foot ladder in July 2012 and football injury in October 2012. [*Id.*] But it was not until October 23, 2014, the day before Bennett filed his application for Supplemental Security Income, that a doctor, Dr. Devens, noted Bennett's limited range of motion of the left lower extremity when raising it from the ground and pain with movement and limp. [*Id.* at 36.] The ALJ noted the suspicious timing of this evaluation and the fact that Bennett only saw Dr. Devens on two other occasions, neither of which involved a complaint of pain in the left hip, in finding that it suggests that Bennett saw Dr. Devens primarily to generate evidence for this application, rather than in a genuine attempt to obtain relief from his allegedly disabling symptoms. [*Id.*]

Bennett had no complaints regarding his hip for almost an entire year, after which he presented to Dr. Person with hip pain and was diagnosed with osteoarthritis of the left hip, resulting in a hip replacement in May 2014. [*Id.*] Bennett appeared to

5

recover well from the hip replacement, not reporting much pain for eight months. [*Id.*] Bennett complained again of pain in March 2015 and was referred to physical therapy, but never went. [*Id.*] The ALJ walks through this history in even greater detail than I just did, noting that the "clinical findings of claimant's treating physicians have varied over time, but do not support functional limitations greater than those set forth in the residual functional capacity over any consecutive twelve month period." The ALJ conducted a very thorough analysis and explanation on this issue and I find that there is substantial evidence to support her RFC determination. And while there might be additional evidence in the record on this issue, the ALJ is not required to discuss every single piece of evidence or testimony presented; instead, she "must provide a 'logical bridge' between the evidence and [his or her] conclusions." *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). She has done so here.

It's worth noting that in making his argument to the contrary, Bennett totally mischaracterizes the ALJ's opinion, asserting that she stated "that there is no evidence that Plaintiff exhibited diminished motor strength or sensation in the lower extremities." [DE 12 at 11.] In fact, the ALJ noted reports of diminished motor strength or sensation in the lower extremities, but ultimately concluded that "there are no indications that the claimant exhibited diminished range of motion, motor strength, sensation or reflexes of the lower extremities *which would support a greater or additional functional limitations.*" [A.R. at 27 (emphasis added).]

6

Bennett also claims that the ALJ ignored evidence regarding Bennett's lower back problems, but neglects to cite anything in the record that the ALJ failed to consider. [DE 12 at 12.] The ALJ spends several paragraphs discussing the diagnostic and clinical findings regarding Bennett's lower back pain and explaining why they do not support greater or additional functional limitations than those set forth in the RFC, which already limits Bennett to sedentary work, requiring only "occasional standing and walking." [A.R. at 38, 39.]; *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. ,2001) The ALJ noted, among other things, that straight leg testing was inconsistent during the period for adjudication, testing by pain management treatment providers was inconsistent, and Bennett had not been referred to physical therapy, administered epidural steroid or nerve block injections, or referred to an orthopedic surgeon for evaluation of his complaints. [*Id.*] Accordingly, the ALJ's decision was supported by substantial evidence and she provided a logical bridge between that evidence and her RFC determination.

Next, Bennett argues that the ALJ failed to discuss the impact of Bennett's carpal tunnel, knee, and neck problems had on his disability. [DE 12 at 12.] This is not true. The ALJ discussed Bennett's carpal tunnel in great detail, noting that while Bennett was diagnosed with carpal tunnel syndrome by his primary care physician in February 2014, no positive clinical findings consistent with such a diagnosis were noted and Bennett at no time exhibited diminished sensation or motor or grip strength indicative of

7

neurological deficits. [A.R. at 33.] The ALJ, therefore, concluded that Bennett's alleged carpal tunnel could not be considered a medically determinable impairment in the absence of positive clinical or diagnostic findings. [*Id.*] The ALJ also discussed Bennett's knee, including that in November 2010, Dr. Schramm noted that Bennett had diminished sensation from the left knee to the first dorsal web. [*Id.* at 35.] The ALJ noted throughout her opinion Bennett's inconsistent use of a cane, with a lack of evidence that it was required as a medical necessity for a period of twelve consecutive months, as well as the fact that in October 2012 and January 2013, Dr. Devens and Dr. Dwyer, respectively, noted that Bennett walked with a limp. [*Id.* at 37-39.] Therefore, to say that the ALJ did not discuss Bennett's left knee is inaccurate. While Bennett might have preferred a more robust discussion, one was not required.

The same goes for the ALJ's discussion regarding Bennett's cervical spine. The ALJ spends several paragraphs discussing Bennett's claimed neck and cervical spine issues, noting that Bennett exhibited normal forward flexion and extension of the lumbar and cervical spine with limited lateral flexion when examined by Dr. Dwyer in 2013 and that, in March 2015, Bennett presented to Dr. Pai with tenderness of the cervical spine, who recommended facet block injections. [*Id.* at 37, 39.] While the ALJ might not have discussed all of the evidence in the record, she was not required to do so.

Finally, Bennett ends this argument with a general, catch-all assertion that the

8

ALJ's proffered RFC has no medical underpinning. [DE 12 at 12-14.] Specifically, he asserts that "the ALJ seemingly provided an RFC that has no medical support or explanation." [*Id.*] That simply is not the case as evidenced by my discussion of her analysis of the medical and treatment records. Bennett challenges the ALJ's decision to discount Dr. Devens' opinion. [*Id.* at 13.] Dr. Devens is a primary care physician who Bennett visited three times. The first time Bennett visited Dr. Devens was the day before Bennett filed his application for Supplemental Security Income and, as I discussed above, the ALJ found this timing suspicious for several reasons. [A.R. at 36.] After his first visit, Bennett only saw Dr. Devens two more times—once for complaints regarding a lump on his neck and a second time for right shoulder pain and medication refills. Based on these three visits, Dr. Devens completed a medical source statement, which the ALJ gave little weight because, as she explained "Dr. Devens described no specific functional limitations and referred to no clinical or diagnostic findings in support of his conclusions. While he was briefly involved in the claimant's treatment, Dr. Devens saw the claimant on only three occasions prior to rendering his March 2013 opinion." [*Id.* at 39.]

It is in the ALJ's purview to discount the treating physician's opinion, but she must provide "good reasons" to explain the weight given to the opinion and support these reasons with evidence. SSR 86-2p, 1996 WL 374188 (July 2, 1996); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). The ALJ must also consider such factors as the length,

9

nature, and extent of the treatment relationship, frequency of examination, the physicians's specialty, and the types of tests performed. *E.g.*, *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). I must allow the ALJ's decision to stand "so long as the ALJ minimally articulated his reasons—a very deferential standard that we have, in fact, deemed lax." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (internal quotation and citation omitted). Here, the ALJ's gave good reasons as to why she discounted Dr. Devens' opinion and her decision, therefore, stands.

Bennett also claims that the ALJ dismissed Dr. Dwyer's consultative exam. [DE 12 at 13.] That is inaccurate. The ALJ quoted from Dr. Dwyer's assessment that Bennett "'probably has some component of disability; however, it was difficult to assess this because of his aggressive behavior and lack of willingness to comply with the standards of the permit, which he had signed previously.'" [*Id*. at 39, *quoting* Dr. Dwyer.] The ALJ determined that this finding had little probative value, but she nonetheless gave great weight to the recorded observations of Dr. Dwyer's examination. [A.R. at 39.] This is because when Dr. Dwyer attempted to perform a consultative physical examination of Bennett, Bennett refused to participate in parts of the examination. So the ALJ gave great weight to the parts of the examination in which Bennett participated, but reasonably was unable to use the final assessment, which did not and could not reach a conclusions as to Bennett's alleged disability. [*Id*.]

In a confusing move, Bennett challenges that ALJ's decision to only give some

weight to the opinions of two agency physicians because the ALJ concluded that they gave inadequate weight to Bennett's subjective complaints and that the evidence from Bennett's hearing, including his 2014 hip replacement, supporter *greater* limitations of Bennett's social interaction than those identified by the agency physicians. [*Id.* at 40.] It is unclear to me how the ALJ's decision to proffer a *more* restrictive RFC than the one suggested by the physicians is troubling to Bennett.

Bennett points to all of these factors and seems to argue that they left an impermissible evidentiary gap. This is not the case for all of the reasons that I have discussed. Overall, the ALJ completed a fairly thorough analysis of Bennett's alleged impairments, linking the copious medical records to her ultimate RFC determination and sufficiently articulating the evidence that she relied on. As such, I find that her determination was supported by substantial evidence.

Bennett's second argument is that the ALJ did not make a proper credibility assessment of Bennett. [DE 12 at 15.] Because the ALJ is in the best position to evaluate credibility, I review an ALJ's credibility findings with deference and may not disturb the weighing of credibility so long as the determinations are not "patently wrong." *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009). To evaluate credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements." SSR 96-7p.[3] The ALJ should consider objective medical

---

[3] Although SSR 96-7p has been replaced with SSR 16-3p, the substantive aspects of SSR 16-3p do not apply retroactively, so SSR 96-7 still governs this case. However,

evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received and medication taken, and "functional limitations." *See* 20 C.F.R. § 404.1529(c)(2)-(4); *Simila*, 573 F.3d at 517. If the ALJ gives specific reasons for her credibility determination, which are supported by the record, her determination will stand. *Murphy v. Astrue*, 496 F.3d 630, 635 (7th Cir. 2007). But the ALJ may not "discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Simila*, 573 F.3d at 517.

In this case, the ALJ adequately explained why she found that Bennett's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. [A.R. at 35.] The ALJ highlighted the fact that Bennett's earnings records reflect a history of sporadic work and earnings generally below those that would represent substantial gainful activity and that there was no evidence of Bennett's work activity from 1999 to 2003 and again from 2004 to 2008. [A.R. at 35.] The ALJ noted that "[h]is largest annual earning of $8,942.50 in 2010, does not suggest a sustained substantial gainful activity," which was potentially indicative of his lack of motivation to work and may call in to question is credibility. [*Id.*] In fact, according to the ALJ, "[t]he claimant's inconsistent work history raises questions as to whether his current unemployment is in fact due to his medical impairments." [*Id.*]

The ALJ also noted several inconsistencies in Bennett's testimony, both internally

---

SSR 16-3p clarifies that the term "credibility" used in SSR 96-7p was "not an examination of an individual's character."

and with statements to treatment providers. [*Id.*] For example, Bennett testified that while able to lift thirty to forty pounds, he could only lift ten pounds repeatedly, the weight of tools or laundry, but then later testified that he is unable to do laundry due to the lifting. [*Id.*] Bennett also testified inconsistently about the distance he can walk. [*Id.*] In addition, the ALJ noted that Bennett testified that he was in constant pain as severe as a ten out of a ten, but rarely reported such severe pain to treatment providers since the alleged onset of his disability. [*Id.*] The ALJ also noted that Bennett refused to perform certain testing as part of a consultative physical examination done by Dr. Dwyer at the request of the Bureau of Disability Determination, including walking on his heels or toes and squatting and displayed a "lack of willingness to comply with the standards of the permit, which he had signed previously." [*Id.* at 39.] In addition, the ALJ found that Bennett's described limited daily activities did not weigh in favor of finding him disabled because they were outweighed by the other factors discussed in the ALJ's opinion. The ALJ is allowed to consider whether the claimant's daily activities are inconsistent with his alleged inability to work outside of the home. *Oakes v. Astrue*, 258 F. App'x 38, 43 (7th Cir. 2007). While the ALJ could have and should have been more specific regarding this last point, she has provided a sufficient explanation overall as to why she found that Bennett's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. The Seventh Circuit has held that even a minor discrepancy among a claimant's statements

13

coupled with observations of the claimant during the hearing is sufficient to support an ALJ's credibility finding. *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013) (citing *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)). What's more, a credibility determination is patently wrong only when it lacks *any* explanation or support. *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008). The ALJ's credibility determination was reasoned and supported and, therefore, not patently wrong.

## Conclusion

In sum, the ALJ's conclusion that Bennett was not disabled during the relevant time period is supported by the evidence highlighted in the ALJ's opinion. And even if reasonable minds could differ concerning whether Bennett was disabled, I must defer to the ALJ's decision so long as it is adequately supported, as it is in this case. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

ACCORDINGLY:

The final decision of the Commissioner of Social Security denying plaintiff Lamont D. Bennett's application for a period of disability and disability insurance benefits is **AFFIRMED**.

The Clerk shall enter judgment in favor of Defendant and against Plaintiff.

**SO ORDERED**.

ENTERED: February 9, 2018.

  s/ Philip P. Simon
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**